# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 8348 | **DATE** | 3/27/2001 |
| **CASE TITLE** | Boyd, et al. vs. Illinois State Police, et al. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendants' motion for summary judgment [34] is granted as to Count II only and denies the motion for all other counts of plaintiffs' complaint. Plaintiff's motion for partial summary judgment [35] is denied. Defendants' motion to reconsider [49] is denied. Status hearing set for 4/26/01 at 10:00 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | 2 | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required. | | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | MAR 2 8 2001 date docketed | | 51 |
| | Notified counsel by telephone. | | | cm | | |
| | Docketing to mail notices. | | | docketing deputy initials | | |
| | Mail AO 450 form. | | | 3/27/2001 | | |
| | Copy to judge/magistrate judge. | | | date mailed notice | | |
| | MD courtroom deputy's initials | | Date/time received in central Clerk's Office | MD mailing deputy initials | | |



UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MOSES BOYD, JR., PEGGY KONRATH, JAIME ZEA, THOMAS HALLORAN, LANEEN BLOUNT, ELLEN CONNOLLY, JEANNE RICHEAL, MURRAY C. SHAMBEE, JR., JOSEPH THIBAULT, JOHN L. McDONALD, ARTHUR KRUSKI, WEBELENE BETHEA, GWENDOLYN BRISTER, LINDA RAYFORD, COTELIA FULCHER, CRYSTAL B. WATSON, JEFFREY BUFORD, JORGE GOMEZ, and LARRY WILSON, <br><br> Plaintiffs, <br><br> v. <br><br> ILLINOIS STATE POLICE and SAM W. NOLEN, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) No. 98 C 8348 ) ) ) ) ) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs' third amended complaint alleges that defendants Illinois State Police ("ISP") and its director, Sam Nolen ("Nolen"), violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), by discriminating against plaintiffs in the compensation, terms, and conditions of their employment, and violated a provision of the Illinois Personnel Code, 20 ILCS 415/12e, in determining the compensation of the plaintiffs. Count I is brought by all plaintiffs except Larry Wilson for Title VII violations; Count II is brought by all plaintiffs for violation of the Illinois statute, and Counts III and IV are brought by Wilson for Title VII violations and for retaliation, respectively. Presently, defendants move for summary judgment on the entire complaint and for this court to reconsider Judge Hart's grant of plaintiffs'

motion to compel,[1] and plaintiffs move for partial summary judgment. For the reasons articulated below, the court grants defendants' motion for summary judgment on count II but denies the motion on all other counts, denies plaintiffs' motion for partial summary judgment, and denies defendants' motion to reconsider Judge Hart's ruling.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-599. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

---

[1] Judge Hart previously presided over this case before it was transferred to this court via an Executive Committee Order entered on September 5, 2000.

## FACTS[2]

In 1995 and 1996, 51 forensic scientists transferred from the Chicago Police Department Crime Lab ("CPD Lab") to the ISP Forensic Science Center ("ISP Lab") pursuant to an agreement reached in 1994 providing for the ISP's assumption of CPD Lab services. Plaintiffs are 19 of the 51 transferred scientists. Twenty-two of the transferees are African-American, five are Hispanic, and 24 are Caucasian. These figures can be further broken down into non-supervisory forensic scientists (19 African-Americans, four Hispanics, and 19 Caucasians) and supervisory employees (two African-Americans, one Hispanic, and six Caucasians). Bruce Vander Kolk, the ISP's Commander of the Forensic Science Command, and Michael Sheppo, the ISP Forensic Sciences Command's Bureau Chief, were assigned the responsibility of coordinating the ISP's assumption of the CPD Lab. In 1993, while plans for the ISP takeover of the CPD Lab were being discussed, "Assistant Deputy Director Crites wrote: 'Fairness and decency dictate that we attempt to resolve this issue so that the effected (sic) employees can know as early as possible whether they have a job.'" (Pls.' Statement of Material Fact ¶ 16.) On October 15, 1994, Sheppo wrote a memorandum to Vander Kolk stating that in response to Vander Kolk's question "as to the effect of the ISP paying salaries of CPD laboratory personnel beginning on January 1, 1996," and after considering many factors, he "would recommend that CPD laboratory personnel not be brought onto the State payroll until the new Chicago laboratory is nearly completed. This would necessitate the State continuing to pay the City of Chicago a

---

[2]The court notes that plaintiffs inconsistently supported their response to defendants' statement of material facts. To the extent plaintiffs disagreed with or denied defendants' statements without citing any support from the record, those unsupported denials will be deemed admissions of defendants' supported facts. *See* Loc. R. 56.1(b)(3)(B) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.").

3

prorated stipend for forensic services at the beginning of 1996." (*Id.* Ex. 1, at 9-10.) Sheppo worked with the Illinois Department of Central Management Services ("CMS") and others to determine staffing levels, create a budget, and receive legislative approval for additional staffers. "The initial staffing plan was to hire 85 new Forensic Science ("FS") Trainees; to hire as many of the CPD Lab forensic scientists as possible; and to transfer other necessary ISP employees to the new facility." (Defs.' Statement of Material Facts ¶ 11.)

Generally, all employment applications are processed through CMS, which grades each applicant based on a particular job's education and experience requirements and then creates lists of eligible applicants. The FS Trainee positions required a college degree with any science specialty. CMS' initial eligibility list for FS Trainee positions contained approximately 1,300 names, of which 570 responded to a request for an interview. After background checks, polygraph examinations, and drug tests, among other things, approximately 85 FS Trainees were hired at salaries ranging from $2,153 to $3,060 per month.

In addition to FS Trainees, there are three levels of forensic scientists: FS I, FS II, and FS III. All salaries for FS positions at the ISP are governed by union contract between the CMS and American Federation of State, County, and Municipal Employees. Moreover, there are ten salary steps with consecutively higher salaries within each FS level. On the anniversary date of employment, an FS employee advances one salary step and receives an additional salary increase. Although advances from FS Trainee to FS I and FS I to FS II are automatic, supervisory approval is required for an employee to advance from FS II to FS III.

Compensation was a major concern for the CPD Lab employees, and, prior to the transfer, the CPD Lab employees had specific questions about salaries and benefits after the

transfer and met periodically with ISP management, including Vander Kolk and Sheppo, to

discuss the new ISP laboratory and the hiring process for the CPD Lab employees. At one of

these meetings, held in November 1994, the CPD Lab employees were given a handout that

attempted to answer CPD Lab employee questions and explain employee salaries at the new ISP

Lab.[3] Moreover, CPD Lab employees were told at the November 1994 meeting that enough

positions were available for those who wished to transfer to the ISP.

Special legislation was needed to bypass the regular CMS hiring process when the ISP

sought to hire the CPD Lab employees. Lab Director Robert Stacey described the transition as a

---

[3]The handout read, in part:

Employees will know their new position and pay scale at the time of offering the position.
Salaries for bench analysts are based on number of years of forensic science experience and where
their present salary fits into the state's pay range.
    FS I - requires one year forensic experience
    FS II - requires three years forensic science experience
    FS III - requires five years forensic science experience
Promotions from FS I to FS II are semi-automatic.
Promotions from FS II to FS III are subject to supervisory approval.
Steps within ranges are automatic.
There is some OT built into the FY96/FY97 budget, however, as a rule ISP pays OT only for
emergency case analysis subject to availability of funds; otherwise OT is covered by CT.
ISP salaries should be comparable to current CPD salaries unless CPD salary exceeds the ISP
salary scale.
Salaries and titles will be determines prior to making an offer. They will be based on CPD
employees current salary and experience.
A person with 23 years as a Criminalist II making $43,000 would have been making $52,020
(4335 mo. x 12) if started as ISP employee.

  A.    What level of compensation is anticipated?
  B.    Will the pay scale with the state be the same as the city or the state pay scale? When will
          employees know what their new positions and pay scales are?
  C.    Will salaries be different for someone with 5, 10, or 20 years experience?
  D.    Is there overtime?
  E.    Will my salary be comparable to my present salary?
  F.    How will our salaries and titles be determined?
  G.    What is the salary of a person with 23 years experience as a Criminalist II making $43,000 what
          [sic] is the salary of the ISP with this experience?

(Pls.' Statement of Material Facts Ex. D at 80.) Defendants contend that all questions corresponded to answers listed
above the question. Plaintiffs argue that question C is left unanswered.

merger and proposed for the legislation "that CPD lab employees be given full seniority within the ISP system including the rights and privileges granted on the basis of seniority through applicable collective bargaining agreements." (Pls.' Statement of Material Facts ¶ 24.) Vander Kolk "agreed with most of Stacey's proposal, but balked at allowing CPD scientists to retain seniority for 'bidding' rights as per the collective bargaining agreement which covered ISP lab employees." (Id. ¶ 26.) Moreover, Vander Kolk wrote that his counterproposal "protects our people." (Id. ¶ 27.) Stacey also initially proposed that CPD Lab employees be placed into the State's "alternative pension formula," which most closely resembled the benefits these employees earned at the CPD, but this proposal could not be accomplished. The ISP advocated, however, that the CPD Lab employees carry over their vacation time, as this proposal benefitted both the CPD Lab employees and the ISP (because, without a carry over of the vacation benefits, CPD employees would take their vacation prior to joining the ISP in order not to lose the benefit and create a backlog of cases). The resultant legislation is found at 20 ILCS 415/12e and became effective August 4, 1995.[4]

---

[4]20 ILCS 415/12e states in full:

§ 12e. Chicago Crime Laboratory employees.
(a) The Department of State Police, in consultation with the Department of Central Management Services, may enter into an intergovernmental agreement with the City of Chicago with respect to the hiring, classification, compensation, merit and fitness, and conditions of employment of former employees of the Chicago Police Department Crime Laboratory Division who are hired by the Department of State Police to work in its Chicago Forensic Science Laboratory in connection with the supervision of forensic scientists or the analysis of physical evidence. The agreement may provide for exceptions to the requirements of this Code (other than this Section) and to the rules adopted under this Code.
(b) Any agreement entered into under this Section shall, at a minimum, include the following provisions for affected employees:
(1) Persons applying for a position must go through a selection process established by the Department of State Police and must meet the Department of Central Management Service's requirements for that position.
(2) Persons hired for a position must go through the appropriate background investigation

(continued...)

In addition to the transfer of certain benefits through the legislative process, each CPD

Lab employee was offered a salary determined by the following two step process:

    a)    the FS level (I, II, or III) was determined by years of forensic science experience, FS I required one or more but less than three years of experience; FS II required three or more but less than five years of experience; and FS III required five or more years of experience. The CPD employee then submitted to CMS an employment application for the purpose of pre-qualification, to ensure that he or she met the qualifications for that classification.

    b)    Salary was determined by looking at the applicant's CPD salary, and fitting that salary into the steps for the particular FS level; the CPD employees were given the next higher step up from their CPD salary. If the CPD employee's anniversary date at CPD was within three months of hiring at ISP, that higher salary was used to determine final salary.

(Defs.' Statement of Material Facts ¶ 46.)

---

[4](...continued)
and pass the required drug screening and polygraph tests.

    (3) The employee's period of service as a Chicago Police Department employee shall be considered for purposes of determining the appropriate level of compensation.

    (4) The employee's period of service as a Chicago Police Department employee shall not be included in calculating the employee's continuous State service or seniority for purposes of collective bargaining provisions.

    (5) Although not included in the calculation of continuous State service, the employee's entire period of service as an employee of the City of Chicago shall be considered for purposes of determining the rate of accrual of vacation.

    (6) The employee may carry over unused and uncompensated sick leave accumulated as an employee of the City of Chicago, but this sick leave (i) may be used only after sick leave earned as a State employee has been exhausted, (ii) shall not be convertible to cash upon retirement or other separation from service, and (iii) shall not be considered sick time for purposes of establishing credit under the Illinois Pension Code.

    (c) The special provisions relating to hiring, classification, compensation, merit and fitness, and conditions of employment established by intergovernmental agreement under this Section apply only to persons who were employed, at some time between June 30, 1995 and the takeover date, by the Chicago Police Department Crime Laboratory Division in connection with forensic or crime laboratory functions that are being transferred to and will be performed by the State under the intergovernmental agreement, and who become employed by the Illinois Department of State Police on or after July 1, 1995 but no later than 6 months after the takeover date to perform services relating to those functions.

    (d) For the purposes of this Section, "takeover date" means the date upon which the Illinois Department of State Police assumes and becomes responsible for performing the crime laboratory functions that are transferred to the Department from the Chicago Police Department Crime Laboratory Division under the intergovernmental agreement authorized by this Section.

ISP made formal job offers to the CPD Lab employees in mid-June 1996, although the parties dispute the reasons for making the offers at this time. It is undisputed, however, that CPD Lab employees were required to work an extra 2.5 hours a week after transferring to the ISP. In addition, the parties dispute whether the employees' salaries increased or decreased as a result of the transfer and the results of a study reviewing the CPD Lab employees' salary transition to the ISP. The disputed study, ordered by Lab Director Laurence Mulcrone, was conducted by Ron Ewert, Section Chief for the ISP Forensic Science Center at Chicago in March 1998. Ewert memorialized his findings in a memorandum to Mulcrone dated March 12, 1998. The first issue Ewert addressed that was raised by the majority of the employees was that "[i]ndividual relative experience was not considered in making the salary/job offer," regarding which Ewert concluded:

> There are many specific dissimilarities with respect to experience at CPD when compared to a comparable ISP career forensic scientist. (See attached P.A. 89-246, section 12e(b) - 3 which spells out generally that CPD "employee's period of service . . . shall be considered for purposes of determining the appropriate level of compensation.") The Public Act provides only a minimum requirement.

(Pls.'s Ex. 1, at 31.)[5] Ewert testified that he destroyed the interview notes used to write the

memorandum. After reviewing Ewert's findings, Mulcrone wrote a memorandum to Vander

Kolk stating that he had met with Ewert several times and "struggled with the proper course of

action to recommend." (Pls.' Statement of Material Facts Ex. 1, at 28.) He also stated,

> I met with FSC-C managers on April 8, 1998 to discuss options to recommend:
> 1. Across the board increase of 1.5 percent for all concerned - rejected
> 2. A review of salary levels for those personnel who received less than a 4 percent increase - rejected
> A concern regarding fairness to all personnel was raised; why would a 4 percent level be selected; what about those who received more than 4 percent, but had a salary increase between January 1 - June 30, 1996 which would have brought their actual increase to 4 percent or below; and other issues!
> 3. No adjustments for anyone; the salaries given on July 1, 1996 would remain. This is recommended.[6]

---

[5]The Ewert memorandum goes on to address four other employee issues as follows:

> 2. Salary offers did not consider cost of living adjustments that these CPD employees eventually received and which were retroactive to July, 1995, an increase of 1.5%. It also excluded their contract negotiated increase of 2.25% which was granted to the employees effective July 1, 1996:
>> This is true, however, it was part of the union bargaining agreement talks which extended their 1995 contract well into 1996 and significantly after salary histories were called for from the City. ISP was aware these negotiations were taking place and could have adjusted their offers respectively.
> 3. Because the offers were made just a few weeks before prior to the transition, they were either unable to negotiate what they perceived as inequities or said they were told the offer was not negotiable:
>> There are at least two former CPD criminalists who did negotiates and did receive improved offers with respect to their particular FS title.
> 4. ISP offers were made based on a salary of an expired contract:
>> This is both true and false. Indeed their CPD salary schedules were eventually raised when a new contract was settled, but this was six months later and while retroactive, they were until that time, still bound under their 1995 contract.
> 5. The difference of a 37.5 hour work week at ISP compared to a 35 Hour work week at CPD was not considered in making the salary offer:
>> This is true.

(*Id.* (citations omitted).)

[6]Mulcrone continues:

> I believe this recommendation (#3) may have a negative effect on the morale of some personnel.

(continued...)

(*Id.*) At Mulcrone's deposition, plaintiffs' counsel asked Mulcrone, "We've noted that the option of treating people based on their years of experience is not listed here. Why would that not have been a fair way to resolve the issue of pay?" (*Id.* Ex 5, at 3-4) Mulcrone responded, "I don't remember why that was not included. It may not have been an option based upon contract process. I don't remember why it wasn't included." (*Id.*) Mulcrone was also asked, "Why is there no option here for raising pay to equal ISP scientists who have the same years of experience," to which he responded, "I don't know. I don't know how that would be done anyway from a union contract perspective, but I don't know – I don't know." (*Id.* at 2.) Mulcrone acknowledged, however "that he had wide discretion to recommend changes to correct disparities" when he stated "I was not aware of nor did anyone impose any limitations on me for my recommendations." (*Id.* ¶ 98 and Ex. 5, at 6.) Vander Kolk concurred with Mulcrone's recommendation to not change the existing salaries of the CPD Lab employees. Since transferring to the ISP, at least 13 former CPD Lab employees, including two of the plaintiffs, received Superior Performance Increases, which raised the employee to the next salary step. Both Sheppo and Vander Kolk attested that they were not aware of any ISP manager telling CPD Lab employees that they would be paid the same salary as incumbent ISP employees with the

---

[6](...continued)
However, there is really no fair way to resolve this issue; I cannot segregate one group and treat them differently (less than 4 percent increase group) because the issues are the same for all personnel. Regrettably, former CPD personnel were told ISP could reevaluate their salaries, leaving many of them with the impression that upward adjustments would occur.

Some former CPD personnel have been submitted for an SPI. Almost all will receive a 6 percent increase July 1, 1998 which could negate some of the ill-feeling. Hopefully, some will recognize the efforts by FSC-C management to address this issue and bring some finality to it.

(*Id.*)

same amount of experience. Plaintiff Wilson testified at his deposition, however, that Sheppo told CPD Lab employees at a transition meeting that CPD Lab employees would be making the same amount of money as an ISP employee with the same amount of experience.

Generally, the ISP only infrequently hires experienced forensic scientists into FS I, FS II, or FS III positions, in part because experienced forensic scientists are difficult to find. The ISP asserts that when it does hire experienced scientists into one of these positions, the ISP adds 10% to the individual's current salary and then assigns a salary step closest to, but not exceeding, the increased salary. Nonetheless, two out of three individuals laterally hired into FS II or FS III positions were assigned salaries that exceeded their prior salaries by more than 10%, and the third individual's salary was reduced because his previous salary exceeded the highest salary for the position he entered. All three of these lateral hires are Caucasian.

Supervisory personnel at the ISP were classified either as Public Service Administrators ("PSA") or as Senior Public Service Administrators ("SPSA"), and within each PSA or SPSA classification is a range of salaries. Eight supervisors, one African-American, six Caucasians, and one Hispanic, transferred from the CPD Lab to the ISP Lab into a PSA classification. Plaintiff Wilson was one of the eight CPD employees transferred into a PSA classification at the ISP Lab. "The same salary formula was applied to each PSA-classified supervisor; his ISP salary was determined by adding 10% to his prior CPD salary, unless that amount exceeded the range of salaries available for the PSA classification, in which case the highest PSA salary was given." (Defs.' Statement of Material Facts ¶ 99.)

In August 1999, Wilson's supervisor submitted to Deputy Director Teresa Kettelkamp a request that Wilson's salary be increased because his salary was low compared to other PSA-

classified supervisors. Kettelkamp submitted an affidavit stating that this type of interim request was not common, requires additional approval, and that she had only received six such requests in the last four years, four of which she approved. Kettelkamp admits, however, that Cecilia Doyle, a Caucasian ISP supervisor, was granted such a request because Doyle "was being paid far less than any other Group Supervisor[]." (Defs' Resp. to Pls.' Statement of Material Facts ¶ 4.) Kettelkamp also asserts that she took no action on Wilson's supervisor's request "because she was aware that he was one of a number of former CPD employees who believed they were paid too little compared to their co-workers, and that is was not right to look only at his case; she further believed that if there were to be changes in salary for Wilson because he thought it was too low, it should be done for all employees, CPD and any others, who also thought their salaries were too low." (Defs.' Statement of Material Facts ¶ 107.) "In 1997, Wilson received about a 2.5% increase . . . ; in 1998, no increases were given to any supervisor; in 1999, Wilson received an 8% increase." (*Id.* ¶ 109.) On October 26, 1999, almost a year after this case was filed, Kettelkamp wrote the following e-mail message regarding a salary adjustment for Wilson to Vander Kolk and Sheppo, among others: "Due to the pending litigation and other issues, we need to give this proposal additional consideration before a final decision can be made. Please suspend all action until further notice." (*Id.* Ex. 1, at 42.)

 After the transition, Wilson believed that the former CPD Lab employees did not receive a warm reception, evidenced in part by the fact that he witnessed Sheppo and Vander Kolk discuss matters with trainees even though Wilson, a supervisor, would have been the appropriate person to speak to about these matters. Plaintiffs filed their EEOC charges on varying dates in September 1998 and filed this action on December 12, 1998.

## DISCUSSION

### Timeliness of the Claims

A Title VII claim generally must be based on events that occurred within 300 days of the plaintiff's filing of an EEOC charge. *See* 42 U.S.C. § 2000e-5; *Hardin* v. *S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir. 1999). Defendants argue in their opening brief that plaintiffs' claims are untimely because they filed their EEOC charges more than two years after their salaries were determined. Wage-based claims of Title VII violations, however, are regarded as continuing in nature since "[e]ach week's paycheck that delivers less to a black than a similarly situated white is a wrong actionable under Title VII . . . ." *Bazemore* v. *Friday*, 478 U.S. 385, 395-96 (1986). *See also Chambers* v. *Am. Trans Air, Inc.*, 17 F.3d 998, 1003 (7th Cir. 1994) ("Pay increases are typically continuing violations, because each pay check at a discriminatory rate is seen as a basis for a separate claim.").[7] For this reason, plaintiffs' claims are not time-barred.

### The Merits of the Title VII Claims

Plaintiffs are relying on the burden-shifting method of proving discrimination set forth in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973).[8] Under the *McDonnell Douglas* framework, plaintiffs must first establish a prima facie case of discrimination. *Freeman* v.

---

[7]Defendants, apparently admitting the futility of any further argument, failed to reply to plaintiffs' argument that their claims should be deemed as continuing violations.

[8]Plaintiffs have failed to allege any facts that may be considered direct evidence of discrimination, which is evidence that "if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption." *Walker* v. *Glickman*, ___ F.3d ___, No. 00-1978, 2001 WL 194510, at *3 (7th Cir. Feb 27, 2001) (internal quotation marks and citation omitted). Moreover, plaintiffs state in their memorandum in support of their motion that they "reserve the 'intentional discrimination' claim for trial" and that "[t]here is much *indirect evidence* of racial animus for such an intent claim." (Pls.' Mem. in Supp. at 11 (emphasis added).)

13

*Madison Metro. School Dist.*, 231 F.3d 374, 379 (7th Cir. 2000); *Malaca* v. *City of Madison*, 224 F.3d 727, 729 (7th Cir. 2000). To establish a prima facie case of disparate treatment, plaintiffs must show (1) they belong to a protected class; (2) they performed their job satisfactorily, (3) they suffered an adverse employment action, and (4) their employer treated similarly-situated employees outside of their protected class more favorably. *See Stockett* v. *Muncie Indiana Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000).[9] Plaintiffs' evidence on their "prima facie case need not be overwhelming or even destined to prevail; rather, . . . plaintiff[s] need present only 'some evidence from which one can infer that the employer took adverse action against . . . plaintiff[s] on the basis of a statutorily proscribed criterion.'" *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 493 (7th Cir. 2000) (quoting *Leffel* v. *Valley Fin. Servs.*, 113 F.3d 787, 793 (7th Cir. 1997)). Defendants argue that plaintiffs cannot meet the fourth requirement of proving that a triable fact issue exists regarding defendants treating similarly situated employees outside the protected class more favorably. The court finds, however, that plaintiffs have met their burden to demonstrate that a fact issue exists on the fourth element of their prima facie case.

Defendants contend that the entire group of forensic scientists from the CPD Lab, which included both minorities and non-minorities, were treated the same and, therefore, no racial discrimination occurred. Plaintiffs contend, on the other hand, that because the CPD Lab group was "majority minority," defendants perceived the group as minority and their motive for discriminating against the group was racial. In *Stewart* v. *Hannon*, 675 F.2d 846 (7th Cir. 1982),

---

[9]If plaintiffs can prove their prima facie case, the burden of production then shifts to defendants to articulate a nondiscriminatory reason for its employment decision, but the burden of persuasion always remains with the plaintiffs. *See Freeman*, 231 F.3d at 379; *Malacara*, 224 F.3d at 729. If defendants articulate such a non-discriminatory reason, the burden will then shift back to plaintiffs to establish that defendants' stated reason is pre-textual and that a discriminatory reason actually formed the basis for defendants' actions. *See Freeman*, 231 F.3d at 379; *Malacara*, 224 F.3d at 729.

the Seventh Circuit made clear that non-minorities had standing to challenge discriminatory practices where the practice also injured the non-minority plaintiff. There, a white school teacher alleged race discrimination in the testing and selection of Chicago school principals. The testing and selection procedures did not discriminate against the plaintiff, but she alleged she worked in an environment subject to racial discrimination, and was deprived of "important benefits from interracial associations." *Id.* at 650. In *Probst* v. *Reno*, No. 94 C 691, 1995 WL 613129 (N.D. Ill. Oct. 17, 1995), the court ruled that a white DEA agent who alleged discrimination based on race because he worked with a black partner had standing to proceed with his claim. In *Kozlowski* v. *Fry*, No. 00 C 5296, 2001 WL 109545 (N.D. Ill. Feb. 5, 2001), the court ruled that men who alleged that discrimination against women resulted in negative effect on their own opportunities for advancement had standing to pursue their Title VII claims. Although the Seventh Circuit has apparently not addressed a situation precisely like the one presented here, the above cited cases persuade this court that the associational discrimination alleged here states a claim on which relief may be granted, and the evidence is sufficient to create a triable issue of fact whether defendants were motivated by race in incorporating plaintiffs into their work force on less favorable terms than would have occurred had the group not been "majority minority."

First, there is no dispute that forensic scientists with the same amount of experience who did not transfer from the CPD Lab, and who, as a group, are predominantly "non-minority," earn higher salaries than the CPD Lab transferees, more than half of whose members are minority. Second, plaintiffs presented evidence that in disregard of defendants' professed procedures for determining salary, two new non-minority hires into FS II or III positions earned salaries that exceeded their prior salaries by more than 10%. This is evidence that defendants were able to

15

disregard their own rules, and it indicates that new non-minority hires of experienced forensic scientists may have begun on more favorable salary terms than the CPD transferees. For these reasons, defendants motion for summary judgment on plaintiffs' claims of disparate treatment will be denied.

Although plaintiffs' complaint does not appear to allege a disparate impact claim, the parties marginally address the issue in their moving papers, and, therefore, the court will briefly discuss the issue here. Disparate impact analysis is a two-step process. First, the plaintiff must make a prima facie showing that the challenged employment practice–even if facially neutral–had a disparate impact on a protected class. *Wards Cove* [*Packing Co.* v. *Antonio*], 490 U.S. [642,] 658 [(1989)]. If the plaintiff clears this hurdle, the case shifts to any business justification the defendant offers for its use of the challenged practice. *Id.* at 658." *Council 31, Am. Fed'n of State, County & Mun. Employees, AFL-CIO* v. *Doherty*, 169 F.3d 1068, 1074 (7th Cir. 1999). Because a fact issue exists as to whether plaintiffs can prove a disparate treatment claim, the court will not further analyze plaintiffs' claim of disparate impact except to note that it rejects defendants' attempt to characterize plaintiffs' claim as one based on comparable worth. Plaintiffs' are not alleging that they are being paid a market rate, based on past or present discrimination, which is less than other non-minority workers, as described in the portion of *Davidson* v. *Board of Governors*, 920 F.2d 441, 445-46 (7th Cir. 1990), quoted by defendants.[10]

---

[10]In *Davidson*, the Seventh Circuit explained as follows:

It is true that an employer cannot defend a discriminatory wage pattern by pointing to the fact that, as a result of discrimination by other employers, blacks or women or members of some other statutorily protected group command lower wages, and it is therefore rational for him to pay them less than he pays white males. *Rucker* v. *Higher Educational Aids Bd.*, 669 F.2d 1179, 1181 (7th Cir. 1982). But if he does not discriminate on racial or other forbidden grounds but merely pays
(continued...)

Indeed, neither side has presented evidence of what forensic scientists are generally worth in the market, and the court could not make such a determination based on the evidence before it. Instead, plaintiffs argue the elements of their prima facie case –that is, that the manner in which the ISP determined salary disparately impacted minorities and that defendants have presented no business justification for the manner in which it determined the CPD Lab employees' salaries.

## Count II: the Illinois Personnel Code Provision

Defendants argue that the Illinois statute does not create a private right of action, and even if it did, the statute was not violated. Assuming *arguendo* that the Illinois statute provides a private right of action, defendants are still entitled to summary judgment on Count II. Plaintiffs claim that defendants violated the following provision of the statute: "The employee's period of service as a Chicago Police Department employee shall be considered for purposes of determining the appropriate level of compensation." 20 ILCS 415/12e(b)(3). Had the statute been properly followed, plaintiffs argue, their salaries would not have been lower than other ISP employees. It is undisputed, however, that the first step of the two-step process used to determine the CPD Lab transferees salaries was to place the transferee in a FS level based upon

---

[10](...continued)
each worker what that worker is worth in the market, he is not guilty of discrimination merely because, on average, black workers are paid less than white, or female less than male. Otherwise comparable worth would be required by Title VII, and we have held that it is not. *American Nurses' Ass'n* v. *Illinois*, 783 F.2d 716 (7th Cir. 1986); *see also American Federation of State, County & Municipal Employees (AFSCME)* v. *Washington*, 770 F.2d 1401, 1407 (9th Cir. 1985); *Spaulding* v. *University of Washington*, 740 F.2d 686, 706-07 (9th Cir. 1984); *Lemons* v. *City & County of Denver*, 620 F.2d 228 (10th Cir. 1980); *Christensen* v. *Iowa*, 563 F.2d 353 (8th Cir. 1977). The theory of comparable worth is that workers should not be paid market wages, because those wages may reflect past or present discrimination, but instead a wage based on the "objective" demands of the job. Whatever the ethical merits or political appeal of this theory, it has no standing in civil rights law.

920 F.2d at 445-46.

his or her years of experience. The act of placing the plaintiffs into a FS level comports with even the plaintiffs' own definition of "consider," which they argue is defined as "to take into view or account, or have regard to in forming an estimate." (Pls.' Resp. at 12.) (This is not to say that the ISP's salary determination process did not violate Title VII. That inquiry, as explained, involves material fact issues not appropriately decided on summary judgment.) The fact that, when considering accrued vacation time, as mandated in subsection (b)(5) of the Illinois statute, the ISP gave the CPD transferees credit for each year of service makes no difference to the outcome on this count. Instead, it simply shows that the ISP, after considering a transferee's years of service, determined that credit should be given for each year. It is also irrelevant that the first step in the salary determination process was in place prior to the enactment of the Illinois statute, as plaintiffs have presented no compelling reason why the statute could not be consistent with some of the procedures already in place at the ISP when the statute was enacted, and the defendants have noted that other requirements, i.e., the requirements on § 12e(b)(1) and (2), were similarly in place prior to the statute's enactment. Because the ISP considered plaintiffs' years of experience when determining what level of compensation they were to receive, no violation of the statute occurred, and summary judgment in defendants' favor is therefore appropriate on count II.

### Retaliation

To prove retaliation, Wilson must show that "he engaged in activity protected under Title VII, (2) he suffered an adverse employment action, and (3) a causal connection between the adverse action and his protected activity." *Fyfe* v. *City of Fort Wayne*, ___ F.3d ___, No. 00-1396, 2001 WL 171173, at *3 (7th Cir. Feb 22, 2001). Defendants do not dispute that

Kettelkamp suspended action on a proposed raise for Wilson because he was a party to this litigation but argue that, because Wilson ultimately received a raise, the delay was not sufficiently adverse as to form the basis of a retaliation claim. Although defendants rely upon *Rabinowitz* v. *Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996), to support their argument, that case involved the denial of a bonus, and more recently in *Hunt* v. *City of Markham, Illinois*, the Seventh Circuit distinguished a raise from a bonus and stated that "the 'bonus' rule . . . does not extend to raises." 219 F.3d 649, 654 (7th Cir. 2000). In the end, however, Wilson's retaliation claim also involves fact issues not appropriately resolved at this time, including how long Wilson was denied a raise and the motive for Kettelkamp's denial. Therefore, summary judgment is denied on Count IV.

## Defendants' Motion to Reconsider

Defendants also move this court to reconsider Judge Hart's order compelling defendants to produce certain e-mail communications. Specifically, plaintiffs' requested all e-mail communications regarding:

> salaries for CPD employees and how they were set, on background investigations, on Lorri Lewis' demotion, on detailing, on polygraphs, on pension issues, on any requested raises for former CPD employees, about SPI's, on managerial hires, discipline of Forensic Scientists or Supervisors, on benefits or salaries for CPD retirees (sworn officers), on Ewert's salary study, legislation relating to CPD employees, on considerations for employing CPD scientists and any other issue relevant to the claims in this case.

(Pls.'s Supp. Statement to Pending Motions to Compel, at 2.) Defendants take issue with the three following areas of the above request, claiming that these areas are irrelevant: (1) background investigations and polygraph examinations; (2) detailing of sworn Chicago Police

19

Officers; and (3) discipline, demotion, and termination.[11] This court will not reconsider Judge Hart's ruling. Plaintiffs' discovery requests were certainly within the scope of Federal Rule of Civil Procedure 26 and there is no reason to conclude that Judge Hart's discretionary ruling was in error. *See Sattar* v. *Motorola, Inc.*, 138 F.3d 1164, 1171 (7th Cir. 1998) (the Seventh Circuit reviews "this kind of evidentiary matter only for abuse of discretion, recognizing that district courts have broad discretion in matters related to discovery") (alterations, citations and internal quotation marks omitted). As such, defendants' motion to reconsider is denied.

## CONCLUSION

For the above stated reasons, the court grants defendants' motion for summary judgment [#34] on Count II only and denies the motion for all other counts of plaintiffs' complaint, denies plaintiffs' motion for partial summary judgment [#35], and denies defendants' motion to reconsider [#49].

ENTER:

Date: March 27, 2001

Enter: *Joan H. Lefkow*

JOAN HUMPHREY LEFKOW
United States District Judge

---

[11]Defendants' motion also stated that even though the Ewert salary study was relevant, this court should defer production until resolution of the summary judgment motions. As summary judgment on the Title VII claims has been denied as to both plaintiffs and defendants, defendants no longer have a basis for asking this court to reconsider Judge Hart's decision to compel production of e-mail related to this topic.